UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION OF
MINORITY VETERANS,

                    Plaintiff,

        v.                                              Civil Action No. 21-1298 (RC)

U.S. DEPARTMENT OF VETERANS
AFFAIRS,

                    Defendant.

### THIRD DECLARATION OF RUTHLEE GOWINS-BELLAMY

I, Ruthlee Gowins-Bellamy, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury:

1.      I am the Supervisory Government Information Specialist for the Department of Veterans Affairs ("VA"), Office of Inspector General ("OIG"), Office of Information Release.

2.      One of my duties as Supervisory Government Information Specialist is to respond to requests for records made pursuant to the Freedom information Act ("FOIA"), 5 U.S.C. § 552, to the OIG Office of Information Release.

3.      I have been employed by the OIG Office of Information Release in this capacity since September 4, 2017. I make the following statements based upon my personal knowledge, which in turn is based on a personal review of the appropriate records in the case file, discussions with relevant FOIA personnel designated for processing the subject request, and information furnished to me in the course of my official duties.

4.      Through the exercise of my official duties, I have become familiar with the background of Plaintiff's FOIA requests and OIG's responses to them. I have also become familiar with the background of this litigation and have read a copy of the Plaintiff's Complaint.

## I.  PLAINTIFF'S ORIGINAL FOIA REQUEST

5.     On November 20, 2020, my office received a FOIA request from Plaintiff's counsel dated November 11, 2020 via email from the FOIA office of VA's Veterans Health Administration ("VHA"). *See* Exhibit A. My office assigned Plaintiff's request a tracking number of 21-00112-FOIA.

6.     On December 23, 2020, the OIG responded to the FOIA request. *See* Exhibit B.

7.     On January 25, 2021, Plaintiff administratively appealed the OIG's response. *See* Exhibit C.

8.     On January 28, 2021, OIG denied the Association's appeal. *See* Exhibit D.

9.     The details of VA OIG's response and processing of 21-00112-FOIA is described in an earlier filed declaration.

## II.  PLAINTIFF'S MODIFIED FOIA REQUEST

10.     On May 11, 2021, Plaintiff's counsel filed the underlying complaint against the VA.

11.     Meanwhile, Plaintiff has continued to seek and receive documents from other components of the VA based on the FOIA request, such as the VA's Veterans Health Administration and VA's Office of Operations, Security, and Preparedness (of which the Office of Security and Law Enforcement, which is a subunit).

12.     My understanding is that, as of this filing, Plaintiff has ongoing administrative proceedings with Veterans Health Administration and the Office of Operations, Security, and Preparedness in regard to the FOIA request, with additional records processing and release likely forthcoming.

13.     On August 10, 2021, to help Plaintiff submit a FOIA request that reasonably described VA OIG records and potentially resolve the case, a VA OIG attorney spoke with

Plaintiff's counsel and the assigned AUSA. The VA OIG attorney explained the various OIG records systems, the relationship between OIG and VA and the types of records OIG maintains, and the significant amount of OIG records available online and publicly accessible.

14.     On August 23, 2021, my office received a forwarded email from Plaintiff's counsel via the assigned AUSA that provided a new list of records that Plaintiff was interested in, which were related to three publicly available OIG reports identified in Plaintiff's administrative appeal. *See* Exhibit E. My office interpreted this as a new FOIA request, but my understanding is that the Court has since determined that this was a modified version of the original FOIA request (hereafter, "Modified FOIA Request").

15.     This Modified FOIA Request asked for documents and information related to three OIG reports on VA law enforcement and security:

   a.   January 30, 2018 - Management of Disruptive Patients Behavior in VA Medical Facilities:

      i.   List of facilities included in OIG review

      ii.  Documents related to noncompliance with VHA policy to inform patients about patient record flags and their right to request amendment or appeal of the designation (page ii of executive summary; and Issue 2 on pp. 12-13) This portion of the report discusses a draft policy that OIG approved and we would like a copy of the draft or final policy. It also discusses an exchange between OIG and VHA to change the notification policy from all patients with record flags to only patients with orders of behavioral restriction.

      iii. Documents related to Issue 4, management of non-patient assaults (p. 15)

    iv.  The underlying records for Table 2 (p. 20). I think this would involve records for 1,025 patients involved in disruptive behavior incidents from July 1, 2015 to June 30, 2016. Any summary analysis, spreadsheets, data records compiled that include the justifications or narrative reasoning for flags or orders of behavioral restriction.

    v.  Specific Documents:

        1.  Acting Deputy Under Secretary for Health for Operations and Management. "Meeting New Mandatory Safety Training Requirements using Veterans Health Administration's Prevention and Management of Disruptive Behavior (PMDB) Curriculum." Memorandum. November 7, 2013.

        2.  VHA Center for Engineering and Occupational Safety and Health, Employee Threat Assessment Team: A Guidebook for Managing Risks Posed by the Disruptive and Threatening Employee, April 2016.

    vi.  Records related to Employee Threat Assessment Teams.

  b.  December 13, 2018 - Inadequate Governance of the VA Police Program at Medical Facilities:

    i.  The OS&LE reports used by OIG that assess the effectiveness of the inspection program for every VA medical facility w/police unit (referenced on page 27)

    ii.  The documentation from the interviews with OSP and VHA employees about roles and responsibilities

      iii.  Underlying data from Table 1: Overview of Police Program Requirements Inspected by OS&LE

      iv.  The underlying data from discussion and cited examples regarding the 119 police chief and 88 medical facility director survey responses

  c.  June 17, 2020 - VA Police Management System Needs Improvement:

      i.  List of five facilities included in OIG review

      ii.  Documentation from the referenced testimonial and documentary information from the 90 VHA, OSP, OIT, and Office of Acquisition and Logistics, and Construction employees (discussed in Appendix B)

      iii.  Data from the responses of the online survey given to 139 VA facility police chiefs on March 5, 2019 and any data from the clarification follow ups (discussed in Appendix B)

      iv.  Documentation related to the referenced responses from DUSHOM.

16.    The majority of records described were not OIG records. Our office did not refer the search for records because the records requested were records described in the three publicly available OIG reports.

### III.  <u>THE SEARCH AND PROCESSING OF RESPONSIVE RECORDS</u>

17.    On August 26, 2021, my office provided part (a) of Plaintiff's request (pertaining to the January 2018 OIG report on the management of disruptive patients) to the OIG Director of Healthcare Inspections and asked for assistance in identifying responsive records related to the January 2018 OIG report. My office contacted this director because the Office of Healthcare Inspections is the unit of OIG that wrote the January 2018 report and therefore would be

responsible for maintaining any underlying records. The current Director of the Office of Healthcare Inspections was on the inspection team for the January 2018 report.

18.     On August 26, 2021, my office provided parts (b) and (c) of Plaintiff's request (pertaining to the December 2018 and June 2020 OIG reports on law enforcement and security) to a Supervisory Auditor in the OIG Office of Audit and Evaluations and asked for assistance in identifying responsive records related to the December 2018 and June 2020 OIG reports. We contacted this auditor because the Office of Audits and Evaluations is the unit of OIG that wrote the December 2018 and June 2020 reports and therefore would be responsible for maintaining any underlying records. The director and manager of the office that wrote these reports performed the search and identified the responsive records.

19.     OIG employees who work in the offices that worked on these specific reports provided my office with the responsive records from the project files. Although not required by FOIA, they also provided my office with answers to Plaintiff's questions. The Office of Audit and Evaluations uses Teammate to store report records in individual project folders for each report. The opened the report project folders, reviewed the items requested in the FOIA request and identified which records in each project folder were responsive. They are most familiar with the report and the project folders in Teammate and are best able to identify the responsive records. The Office of Healthcare Inspections (OHI) uses Sharepoint to store report records in individual project sites for each report. The Director of the Office of Healthcare Inspections opened the Sharepoint site for this particular report and identified the responsive records for the items requested. The requested items were specifically identified from the public report. The Office of Healthcare Inspections Director was on the team that conducted this inspection and wrote this

report. He was familiar with the report and the project site in Sharepoint and best able to identify the responsive records.

20.     My office reviewed the records provided to determine whether they were responsive to the FOIA request. In total, my office determined that 1869 pages of documents and four excel sheets were responsive to the request. All of the records provided by the Office of Audit and Evaluations and the Office of Healthcare Inspections were responsive to the request.

21.     The OIG employees from the Office of Audit and Evaluations and from the Office of Healthcare Inspections maintain all records related to projects and reports written by those offices. They store the records in siloed systems like Teammate and Sharepoint, with each report having its own site within those systems. Therefore these are the only locations likely to have responsive documents.

22.     Within these responsive documents, my office determined that it could process 105 pages of the documents and the four excel spreadsheets for potential release to Plaintiff. The remaining 1,774 pages of these responsive records originated with or belonged to other VA components, specifically to the Veterans Health Administration and the Office of Security and Law Enforcement, which is a unit within the VA's Office of Operations, Security, and Preparedness.

23.     The Department of Justice Guide to the Freedom of Information Act states that when "an agency locates records responsive to a FOIA request, it should determine whether another agency or agency component has a 'substantial interest' in any of the records . . . as a matter of sound administrative practice, it should ordinarily refer those records to their originating agency so that the originating agency can make a direct response to the requestor on those records." (pp. 68-69).

24.     On October 6, 2021, my office referred the 1,774 pages of documents that originated with or belonged to other VA components for processing and direct response.

25.     On October 6, 2021, my office sent Plaintiff a final response to the new FOIA request. In conjunction with the October 6, 2021 response, my office released 95 pages of records with redactions and withheld ten pages of records and the Excel spreadsheets in full. The response letter also informed Plaintiff that it referred 129 pages[1] to the Veterans Health Administration and referred 1,645 pages to the VA's Office of Operations, Security, and Preparedness for processing, as those records originated with or belonged to those offices, and that those agency components would provide a direct response to Plaintiff. Finally, the response letter provided written responses to three questions posed in the August 23, 2021 Modified FOIA Request, explaining where in publicly available reports Plaintiff could find certain information and that OIG had not approved a certain VHA draft policy.

26.     The Office of Security and Law Enforcement (a unit within the Office of Operations, Security, and Preparedness) informed my office that October 8, 2021, they responded to the referral. I reviewed that response letter and the Office of Security and Law Enforcement withheld all records in full. I have been informed that the Office of Security and Law Enforcement has since made a supplemental release.

27.     The Veterans Health Administration also informed my office that on December 22, 2021, it responded to the referral. The Veterans Health Administration released 108 pages in full, released 4 pages with redactions, and withheld 17 pages in full in their initial responses.

---

[1]     Due to a clerical error, the original letter stated that 128 pages had been referred to the Veterans Health Administration, but a corrected response letter was issued to Plaintiff on December 14, 2022.

28.     On November 18, 2022, as previously noted, the Court ordered that the August 23, 2021 email from Plaintiff's counsel seeking documents was a modified FOIA request that replaced the original November 2020 FOIA request.

29.     On December 20, 2022, my office provided a draft Vaughn index to plaintiff's counsel describing the redactions and withholdings in detail.

30.     After further independent review of the VA OIG records, my office has made various supplemental releases to Plaintiff.

31.     On January 11, 2023, fourteen pages of records that were previously withheld in full were released to Plaintiff. Four pages were released in full, and ten were released with minimal redactions. The four pages released in full were two of the excel spreadsheets previously withheld. They are summary spreadsheets and distinct from the remaining excel spreadsheets that are withheld.

32.     On January 30, 2023, ninety-five pages were re-released with a significant number of redactions removed.   Redactions were removed from many survey responses, all survey questions, and email content.

33.     On March 10, 2023, my office re-released one page with one redaction removed under FOIA exemption 6. We determined that the position title previously redacted was not specific enough to identify the individual survey taker therefore it was removed.

## IV. **EXPLANATION OF WITHHELD MATERIAL**

34.     Attached to this declaration is the OIG Vaughn index documenting the FOIA exemptions applied.

35.     For OIG Bates stamped pages 001-033, redactions were made pursuant to FOIA exemptions (b)(5), (b)(6) and (b)(7)(E), as described in more detail in the OIG Vaughn Index.

Exemption (b)(6) was used to protect individual privacy, here consisting of email addresses and position titles that could identify individuals who participated in a confidential OIG survey and at times could identity the individual responsible for a particular response. Exemption (b)(5) was used to protect the deliberative process, specifically internal communications, and confidential responses to OIG surveys by agency employees. Exemption (b)(7)(E) was used to protect records compiled for law enforcement purposes which would reveal techniques and procedures for law enforcement investigations and prosecutions or would disclose guidelines for law enforcement investigations or prosecutions.

36.    For OIG Bates stamped pages 034-047, redactions were made pursuant to FOIA exemptions (b)(5) and (b)(6), as described in more detail in the OIG Vaughn Index. Exemption (b)(5) was used to protect the deliberative process, specifically internal email communications consisting of follow-up interview questions regarding specific agency employees' confidential survey responses. Exemption (b)(6) was used to protect individual personal privacy, here consisting of names, titles, email addresses and phone numbers.

37.    For OIG Bates stamped pages 048-095, redactions were made pursuant to FOIA exemptions (b)(5), (b)(6) and (b)(7)(E), as described in more detail in the OIG Vaughn Index. Exemption (b)(5) was used to protect the deliberative process, specifically internal communications consisting of confidential responses to VA OIG surveys. Exemption (b)(6) was used to protect individual personal privacy, here consisting of titles and email addresses. Exemption (b)(7)(E) was used to protect records compiled for law enforcement purposes which would reveal techniques and procedures for law enforcement investigations and prosecutions or would disclose guidelines for law enforcement investigations or prosecutions.

- 10 -

38.     For OIG Bates stamped pages 96-105, redactions were made pursuant to FOIA exemptions (b)(5), (b)(6) and (b)(7)(E), as described in more detail in the OIG Vaughn Index. Exemption (b)(5) was used to protect deliberative process, specifically internal notes made by OIG staff to prepare to organize and write the OIG report and very limited information from some of the email communications. Exemption (b)(6) was used to protect individual personal privacy, here consisting of names, titles, email addresses and phone numbers. Exemption (b)(7)(E) was used to protect records compiled for law enforcement purposes which would reveal techniques and procedures for law enforcement investigations and prosecutions or would disclose guidelines for law enforcement investigations or prosecutions.

39.     Large excel spreadsheet #1 was withheld in full, pursuant to FOIA exemptions (b)(5), (b)(6) and (b)(7)(E), as described in more detail in the OIG Vaughn Index. Exemption (b)(5) was used to protect deliberative process, specifically the internal, pre-decisional notes, questions and comments between OIG staff. The information collected in this excel spreadsheet is what line-level OIG staff thought was relevant to the audit. OIG staff reviewed VA police records and developed the topic columns based on what they thought was relevant and exercised their judgment regarding what information to enter into each row. Exemption (b)(6) was used to protect individual personal privacy, here consisting of names and titles of OIG employees, names of victims of crimes, and names of VA employees. Exemption (b)(7)(E) was used to protect records compiled for law enforcement purposes which would reveal techniques and procedures for law enforcement investigations and prosecutions or would disclose guidelines for law enforcement investigations or prosecutions.

40.     The summary excel sheets, OIG Bates pages 108-109 and 106-107, were released in full.

41.     Large excel spreadsheet #2 was withheld in full, pursuant to FOIA exemptions (b)(3) (citing 38 U.S.C. § 5701 and 38 U.S.C. § 7332), (b)(5) and (b)(6), as described in more detail in the OIG Vaughn Index. Exemption (b)(3) was used to protect the confidential nature of benefit claims made by veterans and their dependents and the confidentiality of certain medical records and veteran patients and social security numbers. Exemption (b)(5) was used to protect the deliberative process. This excel spreadsheet was created by OIG staff as part of the process of reviewing VHA patient health records. OIG staff reviewed patient health records and entered what they interpreted to be relevant portions of those records into this spreadsheet, along with deliberative notes, questions and communications between OIG staff. The information in this spreadsheet was culled from a much larger universe of information and illustrates OIG employees' exercise of judgment regarding what information is relevant to the pre-decisional findings and recommendations. Exemption (b)(6) was used to protect personal privacy including patient social security numbers, OIG employee names and titles, dates of death and other details about patients which could be used to identify them.

## V.  FORESEEABLE HARM FROM DISCLOSURE AND SEGREGABILITY

**A. Confidential OIG survey questions and responses on VA law enforcement practices and security, and related follow up communications, undertaken in the preparation of published OIG Reports (OIG Bates 001-105)**

42.     OIG Bates 1–33 and 48–95 are three confidential OIG survey questions and responses pertaining VA law enforcement practices and security, which were reflect internal agency deliberations in formulation and preparation of OIG Reports on these issues. OIG staff prepared the survey questions based on topics and issues they thought important to explore, and the survey takers who provided responses were the VA Chiefs of Police and Veterans Health Administration medical directors.

43.     OIG Bates pages 34–47 are emails ranging from March to April 2019 between OIG staff and survey respondents following the confidential OIG survey, containing follow up questions and responses that were part of the deliberations leading to published OIG Reports.

44.     OIG Bates pages 96-105 are internal emails sent in December 2018, January 2019 and July 2019 between OIG staff and the Deputy Undersecretary for Health at the time and her staff. They contain follow up questions and responses that were part of the deliberations leading to a published OIG report.

45.     My office withheld information in part from each of these documents pursuant to FOIA Exemptions 5 and 6, and also withheld information in part from the three confidential OIG survey questions and responses under Exemption 7(E).

46.     Disclosure of internal communications consisting of confidential responses to VA OIG surveys protected by the deliberative process privilege would foreseeably cause harm to the VA. Agency employees would not believe future assurances of confidentiality when asked to participate in VA OIG surveys and release of these internal, pre-decisional communications would harm the trust and cooperation OIG has established with agency employees that is necessary to carry out the obligations under the Inspector General Act.  Release of this information could confuse the public because they contain topics and concerns that were not published in the final report which would harm OIG's credibility, they contain issues that may be addressed in future OIG reports and release would undermine those audits and investigations, and they contain the confidential communications from agency employees to OIG staff and release would violate assurances of confidentiality and could identify the participating employees. Release of these communications would harm the trust OIG has established with employees' and harm future cooperation because if they were released now, in the future agency employees may not feel free

to openly communicate with OIG staff, instead they would have to limit and edit their communication because it might be released publicly. This is especially harmful to OIG work, because the OIG staff could lose the trust and cooperation of agency employees. It is essential that agency employees feel free to communicate openly with OIG employees so that OIG can collect the information it needs from the agency to ensure that audits and investigations are factual, accurate and contain helpful and appropriate recommendations. The very small number of agency employees who responded to further questions via email could lead to the identification of individuals who provided information to OIG. Release of information under the forgoing circumstances harms OIG's ability to conduct effective oversight and interferes with the requirements for unhindered and confidential communication envisioned by the Inspector General Act.

47.    Release of identifying information, including work-related contact information, would be particularly harmful because it would reveal the individuals who participated in a confidential OIG survey and these individuals have a privacy interest in this information. The release of names, titles, email addresses and phone numbers would violate the privacy interest that VA employees have in being free from harassment. As described in more detail in the OIG Vaughn Index, the foreseeable harms that justify the withholdings are that agency employees who participated in a confidential OIG survey would be identified and the release of these internal, pre-decisional communications would harm the trust VA OIG has established with agency employees, hampering the cooperation and communication that is required for VA OIG to carry out its duties under the VA's Inspector General Act, and it could lead to agency employees and OIG staff limiting and editing their open communication in the future. Release of this identifying information would harm the trust OIG has established with employees' and harm future cooperation because

if they were released now, in the future agency employees may not feel free to openly communicate with OIG staff, instead they would have to limit and edit their communication because it might be released publicly. This is especially harmful to OIG work, because the OIG staff could lose the trust and cooperation of agency employees. It is essential that agency employees feel free to communicate openly with OIG employees so that OIG can collect the information it needs from the agency to ensure that audits and investigations are factual, accurate and contain helpful and appropriate recommendations.

48.     Release of this personally identifiable information would not shed light on how the VA does business. The mission of the VA is to provide healthcare to Veterans, help service members transition out of military service, provide burial services for Veterans and eligible family members, and improve the Nation's preparedness for response to war, terrorism, national emergencies, and natural disasters.

49.     Release of the information withheld under Exemption 7(E) would reveal techniques and procedures for law enforcement investigations and prosecutions or would disclose guidelines for law enforcement investigations or prosecutions. The redacted information contains specific details about the process and techniques for various types of investigations and release of that information could result in circumvention of those procedures and techniques. The redacted information reveals information about law enforcement techniques and procedures as well as guidelines for handling criminal investigations of misconduct that occurs on VA property. For example, the free form survey responses contain specific information about investigative and law enforcement techniques. The redacted information contains specific details about criminal investigation processes and procedures, including thresholds, details of law enforcement standard operating procedures and guidelines for the process of investigating a variety of crimes that occur

on VA health facility property. Responses to these survey questions contain details about how each facility conducts investigations. Disclosure of these confidential survey responses could reasonably be expected to risk circumvention of the law. There is specific information about databases used for law enforcement purposes and what information is collected. The redacted information contains specific details about criminal investigation processes and procedures, including thresholds, details of law enforcement standard operating procedures and guidelines for the process of investigating a variety of crimes that occur on VA health facility property. These specific techniques, procedures and guidelines vary depending on facility resources and they are not known to the public. If released the foreseeable harm is that individuals could circumvent those processes to avoid prosecution. The redacted information contains details about how police databases are used to investigate, prosecute and track crimes and the procedures for the use of those databases. The redacted information contains details about physical security assessments and the law enforcement system used to conduct the assessments. The redacted information contains details about guidelines for collecting data on risks and facility safety vulnerabilities. The redacted information includes specific details on where data is stored in each facility.  Release of law enforcement techniques, procedures, guidelines and specific information about databases could reasonably be expected to risk circumvention of the law.

**B. Spreadsheet containing information selected from broader review of VA police records for discussion and review in preparing OIG report on VA law enforcement and security (Large Spreadsheet #1)**

50.     This large excel spreadsheet (72 rows, 29 columns) consists of information lower-level OIG staff decided was relevant for discussion and review by the OIG team and higher-level staff, collected by lower-level staff from the review of VA OSLE police records and then reviewed and discussed by higher-level staff as part of the process of conducting this report.

51.     Large Spreadsheet #1 was withheld in full pursuant to FOIA Exemptions 5, 6 and 7(E).

52.     There is a foreseeable harm from disclosure under Exemption 5. This excel spreadsheet comprises an early step in this particular OIG audit and report. The audit team reviewed thousands of pages of police records and each column and each entry in the spreadsheet is a decision to include or exclude factual information and is a determination about whether factual information exists to move forward with a particular finding or recommendation for the Department. Many of the comments in the excel spreadsheet contain information obtained by OIG employees through follow-up questions to agency employees. If OIG employees expect that their comments, assessments and deliberations will be publicly disseminated, they will temper their candor and that will harm the OIG decision-making process. Release of these internal notes and communications could confuse the public because they contain discussions and concerns that were not published in the final report – therefore release would harm OIG's credibility. Release of these records would hamper ongoing and future OIG audits and investigations because they contain issues that may be addressed in ongoing or future OIG reports. And release of these records, which contain the assessments and comments from OIG staff about the underlying records reviewed, would harm the necessary internal debate and candid consideration of issues. Candid discussion amongst OIG audit team members ensures that audits are conducted accurately and appropriately, which also ensures the final report is factually accurate with appropriate recommendations. Release would cause harm because in the future OIG employees would not feel free to communicate openly with team members and supervisors – instead they would have to limit and edit their open communication because it might be released publicly. This is especially harmful to OIG work, where it is vital that employees be free to communicate while conducting necessary

oversight work like audits and investigations. Release of information under the foregoing circumstances not only harms the OIG audit and investigation decision-making process but the ability of OIG to conduct oversight and publish work product as required under 38 USC 312.

53.     There is foreseeable harm from disclosure of the personal privacy protected information. This information includes identifying information of victims of crimes, including some minor victims and names and titles of VA and OIG employees. The foreseeable harm from release of victim information is violation of privacy, embarrassment and further harassment from suspects. The foreseeable harm from the release of OIG employee contact information is a violation of privacy and possible harassment and interruption in work. The release of identifying information for these individuals would violate the privacy interest they have in being free from harassment.

54.     Release of this personally identifiable information would not shed light on how the VA does business. The mission of the VA is to provide healthcare to Veterans, help service members transition out of military service, provide burial services for Veterans and eligible family members, and improve the Nation's preparedness for response to war, terrorism, national emergencies, and natural disasters.

55.     Release of the information withheld under Exemption 7(E) would reveal techniques and procedures for law enforcement investigations and prosecutions or would disclose guidelines for law enforcement investigations or prosecutions. The excel spreadsheet contains information about law enforcement techniques and procedures specific to the handling of disruptive behavior at VA facilities. The data contains information on law enforcement techniques and procedures to handle threatening behavior and thresholds for the involvement of law enforcement. The data collected and entered by OIG contains information about law enforcement techniques and

procedures related to investigating assaults. The excel spreadsheet contains information about a law enforcement database used specifically for the tracking and investigation of threatening behavior. Disclosure of this information could allow individuals to avoid investigation and tracking of threatening behavior. The disclosure of this spreadsheet could reasonably be expected to risk circumvention of the law.

56. As previously stated, my office has released in full the excel spreadsheet that contains a summary version of the information contained in this spreadsheet.

## C. Spreadsheet containing relevant information selected from broader review of patient health records for discussion and review in preparing OIG report on VA law enforcement and security (Large spreadsheet #2)

57. My office withheld in full this Excel document referred to as Large Spreadsheet #2, This large excel spreadsheet contains relevant information selected from broader review of patient health records for discussion and review in preparing the January 2018 OIG report on VA law enforcement and security. More specifically, this large excel spreadsheet (1230 rows, 44 columns) that consists of information lower-level OIG staff decided were relevant for collection, discussion, and review by the OIG team and higher-level staff. It contains information collected by lower-level OIG staff from the review of patient health records and then reviewed and discussed by higher level staff as part of the process of conducting this inspection.

58. This document was withheld pursuant to FOIA Exemption 3 (under 38 U.S.C. § 5701 and 38 U.S.C. § 7332), Exemption 5 under the deliberative process privilege, and Exemption 6. Further information about the withholdings are provided in the Vaughn Index.

59. There is foreseeable harm from disclosure of the intra-agency deliberations. This excel spreadsheet comprises an early step in this particular OIG audit and report. The audit team reviewed thousands of pages of veteran patient health records and each column and each entry in the spreadsheet is a decision to include or exclude certain factual information and is a

determination about whether factual information exists to move forward with a particular finding or recommendation for the Department. Many of the comments in the excel spreadsheet contain information obtained by OIG employees through follow-up questions to agency employees. This extensive review of records is an early part of the deliberative process of this audit. If OIG employees expect that their comments, assessments and deliberations will be publicly disseminated, they will temper their candor and that will harm the OIG decision-making process. Release of these records could confuse the public because they contain discussions and concerns that were not published in the final report – this would also harm OIG's credibility. Release of these records would hamper ongoing and future OIG audits and investigations because they contain issues that may be addressed in ongoing or future OIG reports. And release of these records, which contain the assessments and comments from OIG staff about the underlying records reviewed, would harm the necessary internal debate and candid consideration of issues. Candid discussion amongst OIG audit team members ensures that audits are conducted accurately and appropriately, which also ensures the final report is factually accurate with appropriate recommendations. Release would cause harm because in the future OIG employees would not feel free to communicate openly with team members and supervisors – instead they would have to limit and edit their open communication because it might be released publicly. This is especially harmful to OIG work, where it is vital that employees be free to communicate while conducting necessary oversight work like audits, inspections and investigations. Release would also cause harm to the veteran patients because the information discussed by OIG staff is private health information. Release of information under the foregoing circumstances not only harms the OIG audit, inspection and investigation decision-making process but the ability of OIG to conduct oversight and publish work product as required under 38 USC 312.

60.     There is foreseeable harm from disclosure of the personal privacy information. The information protected under Exemption 6 includes veteran patient names and identifying information, OIG employee names and titles, dates of death and other specific health information that could be used to identify veteran patients. The foreseeable harm is a violation of veteran patient privacy, embarrassment and possible harassment.

61.     Release of this personally identifiable information would not shed light on how the VA does business. The mission of the VA is to provide healthcare to Veterans, help service members transition out of military service, provide burial services for Veterans and eligible family members, and improve the Nation's preparedness for response to war, terrorism, national emergencies, and natural disasters.

62.     No foreseeable harm analysis is required for the information withheld under Exemption 3, as my office is required by law to protect from disclosure the patient health records and related identifying information under 38 U.S.C. § 5701 and 38 U.S.C. § 7332.

63.     Exemption 3 protects information that is "specifically exempted from disclosure by statute . . . provided that such statute (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph." 5 U.S.C. § 552(b)(3). The following types of information are exempt pursuant to (b)(3):

64.     38 U.S.C. § 5701(a) states that "[a]ll files, records, reports, and other papers and documents pertaining to any claim under any of the laws administered by the Secretary and the names and addresses of present or former members of the Armed Forces, and their dependents, in

the possession of the Department shall be confidential and privileged." The limited circumstances allowing for disclosure do not include FOIA requests submitted to the VA. 38 U.S.C. § 5701(b).

65.    38 U.S.C. § 7332(a)(1) states that "[r]ecords of the identity, diagnosis, prognosis, or treatment of any patient or subject which are maintained in connection with the performance of any program or activity (including education, training, treatment, rehabilitation, or research) relating to drug abuse, alcoholism or alcohol abuse, infection with the human immunodeficiency virus, or sickle cell anemia which is carried out by or for the Department under this title shall . . . be confidential." The limited circumstances allowing for disclosure do not include FOIA requests submitted to the VA. 38 U.S.C. § 7332(b), (e)-(f).

66.    All reasonably segregable non-exempt material has been released. My office comprehensively reviewed the information contained in large excel spreadsheet #1 and large excel spreadsheet #2 and conducted a line-by-line segregability analysis for the remaining responsive records. After careful and extensive examination, my office determined that only the material subject to each exemption was redacted or withheld and that none of this material could be released without causing a foreseeable harm to the agency and its operations.

67.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Executed this 21st day of March, 2023.



_____
Ruthlee Gowins-Bellamy

Supervisory Government Information Specialist
Department of Veterans Affairs
Office of Inspector General

- 22 -

Office of Information Release